FILED

01/16/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 4, 2019 Session

## JONATHAN MITCHELL GRIMES v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Gibson County**
**No. H-8987    Clayburn Peeples, Judge**

———————————————————

### No. W2018-01665-CCA-R3-PC

———————————————————

Petitioner, Jonathan Grimes, appeals from the denial of his petition for post-conviction relief, which sought relief from his conviction of aggravated sexual battery. On appeal, Petitioner asserts four claims of ineffective assistance of counsel: (1) trial counsels did not take reasonable steps to keep the State from presenting prejudicial allegations at trial that were not included in the indictment; (2) trial counsels failed to communicate a favorable plea and failed to actively seek out a favorable plea for Petitioner; (3) trial counsels failed to visit or take photos of the crime scene; and (4) trial counsels failed to present evidence of the victim's medical history regarding her credibility. After reviewing the briefs and the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Frederick H. Agee, Milan, Tennessee, for the appellant, Jonathan Mitchell Grimes.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Garry Brown, District Attorney General; and Jason Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### BACKGROUND

Following a jury trial, Petitioner was convicted of aggravated sexual battery of a child less than thirteen years old, as a lesser included offense of the indicted charge of rape of a child. Petitioner was sentenced to ten years at one hundred percent release

eligibility. Affirming his conviction on appeal, this Court summarized the facts presented at Petitioner's trial:

> This case concerns allegations by the victim that [Petitioner], her stepfather, molested her. [Petitioner] was subsequently indicted for rape of a child and aggravated sexual battery.
>
> The thirteen-year-old victim testified that when she was eight years old, she moved to Medina, Tennessee, where she lived with her mother, brother, and grandmother for approximately a year and a half. She remembered having her ninth birthday while they lived in Medina. The victim said that her mother and [Petitioner] began dating some time during that time period and that [Petitioner] moved in with her family shortly after her family moved to Medina.
>
> The victim recalled an incident during the time period that they lived in Medina when [Petitioner] was tickling her and her brother and [Petitioner] touched her vagina on the outside of her underwear. She stated that she was wearing a skirt at the time of this incident. When this incident occurred, her mother was standing at the door, and her brother was being tickled as well. The victim did not immediately tell anyone about this incident. In addition, the victim said that each night [Petitioner] would tuck her into bed, he would touch her "private spot." On one particular night, [Petitioner] placed his hand under her clothes and penetrated her vagina with his finger. When this occurred, she rolled over, and [Petitioner] stopped touching her. She said [Petitioner] penetrated her vagina with his finger on only one occasion. The victim told her brother about these incidents of abuse, and when [Petitioner] deployed to Iraq, she told her mother that [Petitioner] had been touching her inappropriately. When the victim's mother confronted [Petitioner] about the victim's accusations, [Petitioner] denied any abuse. The victim said her mother never contacted the police about [Petitioner's] abuse of her.
>
> On a different occasion, the victim awoke to discover that she was on top of [Petitioner] and that her pants had been pulled down. When she pulled her pants up, [Petitioner] asked her what was wrong, and she told him she was scared of monsters and returned to her room. On a different occasion, [Petitioner] told her that he wanted to tickle her naked, so he took her to the room she shared with [her] brother, placed her on the top bunk, removed her clothing, and tickled her naked after blocking the door with his foot so that her brother could not get into the room. She explained that [Petitioner]

- 2 -

was able to tickle her on the bed and still have his foot blocking the door because the room was very small. During this incident, the victim screamed for her brother, told [Petitioner] to stop, and covered her body with the sheets as her brother tried to get in the room. [Petitioner] finally stopped touching her and left the room. When her brother gained entry into the room, she told him what [Petitioner] had done to her moments before. The victim said that after she told her brother about [Petitioner's] abuse, her brother disclosed this abuse to a school counselor. The victim later told this counselor that she had been abused by [Petitioner].

The victim stated that when [Petitioner] returned home from military deployment, they moved to a house in Milan, Tennessee, where the victim lived from age nine to age ten. She stated that there were other incidents involving [Petitioner] that occurred after the family moved to Milan. On one occasion, when her mother was at work, [Petitioner] tried to make her try on old clothing and told her that she had to disrobe completely. When she refused, he spanked her. She then told [Petitioner], "I'm going to get you back." She explained that this meant she was "going to tell on him." However, she acknowledged that by the time her family moved to Milan, she had already told her mother about [Petitioner's] abuse of her in Medina, even though her mother "didn't do anything." On another occasion, when the victim was nine years old and her mother was at work, [Petitioner] helped her get conditioner out of her hair and "stroked parts of [her] body." She said, "[Petitioner] was just taking the sponge and was scrubbing me on my stomach and then he went down to my private part, of course, and he said you need to wash it." The victim said she told him to get away and was unsure whether she told her mother about that incident.

On still another occasion, when they were playing "cops and robbers," [Petitioner] tied the victim's hands to the bedpost and pulled down her pants against her will and then walked away. The victim stated that [Petitioner] did not touch her inappropriately during the incident. Her brother, who had been trying to get into [Petitioner's] bedroom, was able to enter the room and free her. The victim also recalled an incident when [Petitioner] bent over to help her with her homework and placed his elbow on her pants so that his elbow was in contact with her vagina. She said she pushed him away because she did not "want anything touching [her] there[.]" In addition, the victim recalled an incident, although she did not know her age at the time, when [Petitioner] instructed her to masturbate in the shower, and she complied. The victim stated she watched movies

containing sexual content with [Petitioner] and her family. She denied watching these movies with [Petitioner] alone.

The victim stated that she had never been molested by any adult other than [Petitioner]. She acknowledged that although she threatened to get [Petitioner] back when he spanked her, her brother was the one who disclosed [Petitioner's] abuse of her to the school counselor. She explained that when she made that statement about getting [Petitioner] back, she meant that she was going to tell someone about his abuse of her with the hope that they could stop it. The victim asserted that she had told the truth about what [Petitioner] had done to her. She denied confusing [Petitioner] with someone else who had touched her inappropriately.

When the victim was asked if she remembered having hallucinations about bugs being on her in the hospital even though there were no bugs, she stated, "Really, I don't even know what was going on then." She stated that her babysitter did not show her pornographic movies; instead, she remembered "picking [the disks] up and thinking it was a movie and putting them in." She did not recall going to Pathways in 2006 for treatment for anxiety after the pornographic movies. The victim remembered "going to the doctors about the bugs and . . . seeing the movies, but that's all." She acknowledged that she did not inform the forensic interviewer or the district attorney about the incident in which [Petitioner] tied her to a bed. However, she asserted that she told the forensic interviewer she could not remember everything that happened and was going to tell her about the incidents she remembered. The victim acknowledged telling [Petitioner] on several occasions that she was going to get him back. She said she began to dislike [Petitioner] when he began disciplining her and her brother and spanking them. She added, "I started not feeling comfortable with all that he'd been doing, touching me and hitting us and stuff, so I just started not liking him."

The victim's twelve-year old brother testified that he recalled an incident in Medina when [Petitioner] and his sister were in a bedroom and he could not get in the bedroom. He stated that the victim was yelling his name, and he could not get inside the room because [Petitioner] had braced his foot on the door. He said that when [Petitioner] left the room, he ran inside, and the victim was okay. The victim's brother also recalled an incident in Milan when [Petitioner] and the victim were alone in a locked room. He explained that that they were playing hide and seek. The victim had gone into another room to hide, and he heard her start yelling. Because he was

unable to open the door, he hid, and when [Petitioner] left the room, he went inside. He said the victim "was tied up and her pants were down." He said that although her pants were down, her panties were not down. He stated that "[the victim's] eyes were tied with some kind of cloth and her arms were tied with a belt." He also said "[h]er feet were tied with a belt."

Heather Gordon, a Child Protective Services Investigator with the Department of Children's Services in Gibson County, investigated the case involving the victim. She contacted law enforcement, who did an initial interview of the victim. Because the victim disclosed that she had been sexually abused in the initial interview, Gordon set up a forensic interview with the victim.

[Petitioner] testified that he never sexually abused or inappropriately touched the victim in any way. He met the victim's mother in spring 2007, and they married in February 2008. [Petitioner] said he was deployed to Iraq from the middle of May 2007 to February 2008, when he returned home for two weeks and married the victim's mother before returning to Iraq until June 2008.

During his deployment, [Petitioner] called home, and the victim's mother, who by that time was his wife, informed him that the victim had accused him of "touching her inappropriately." He replied, "That's not possible. I've been in Iraq since right after Mother's Day." [Petitioner] said that as he and the victim's mother asked the victim questions about her abuser, the victim disclosed that the person who touched her inappropriately drove a red car. [Petitioner] said he had always driven a white truck. The victim's mother acknowledged that she had an ex-boyfriend who drove a red car, and by the end of the conversation, [Petitioner] and the victim's mother believed that the ex-boyfriend was responsible for the victim's abuse. [Petitioner] acknowledged that neither he nor the victim's mother ever contacted the police about pressing charges against the person they believed was responsible for molesting the victim.

[Petitioner] stated that he returned from Iraq in June 2008 and moved into the family's trailer in Medina. He lived with the family in Medina from June 2008 to November 2008, when [Petitioner] and the family moved into a house in Milan. At the end of 2008, Niva Abiles moved in with the family because she was having a difficult time financially.

[Petitioner] said that when he began dating the victim's mother, he learned that the victim "had been shown pornographic images by her babysitter and had been treated at Pathways for anxiety because of the pornography." He also learned that the victim in 2006 "had a hallucinogenic episode where she was treated at the McKenzie Hospital and during this episode she had stripped all of her clothes off and was looking for bugs that were on her[,] and the nurse . . . state[d] in her report that there were no bugs [any]where." [Petitioner] stated that he could not recall the incident described by the victim that allegedly occurred in Medina when she awoke on top of him with her pants down. He stated, "I'm a heavy sleeper so I do not recall her ever being on top of me." [Petitioner] said he would sometimes return home from work at 3:00 a.m. and find the victim in his and his wife's bed, and he would move the victim to her own bed. [Petitioner] acknowledged that he bathed the victim, although he denied touching her inappropriately while doing so. He said he bathed her because he had gotten a phone call from his wife, the victim's mother, who told him that the victim had been smelling bad and that he needed to show her how to clean herself. He stated that the victim's mother was unable to teach the victim how to bathe because she was at work. [Petitioner] denied touching the victim inappropriately or sexually while he was teaching her how to bathe. He admitted that he showed the victim how to bathe after the victim accused him of molesting her.

[Petitioner] acknowledged that he frequently played a tickling game with the victim and her brother in which he would grab them by their ankles, hold them up, and tickle their stomach or under their arms. Although he said the victim liked the game at first, she "would say her pants were falling down and she was uncomfortable and I would let her go." [Petitioner] said, "[N]ormally that would end that play episode, 'cause . . . it's kind of hard to continue when you've already been accused [of touching her inappropriately] and you just don't want to even be close to it." He acknowledged that he might have accidentally touched the victim's vagina while he was tickling her, but he denied tickling her for "sexual gratification or arousal." He admitted that he continued to tickle the victim after the victim accused him of sexually abusing her.

[Petitioner] asserted that he would not have been able to brace his foot against the door of the victim's bedroom in Medina if he was standing by her bed. He acknowledged that he disciplined the victim and her brother when he returned from his deployment in Iraq by yelling at them, grounding them, taking away their video games, and spanking them. He

- 6 -

stated that it did not make him feel uncomfortable to discipline the victim after she had made allegations of sexual abuse against him. [Petitioner] denied sexually abusing the victim while spanking her.

[Petitioner] said that the victim did not like being disciplined. He recalled an incident when his friend Theodore Smith was at his house playing video games and he told the victim to clean up her clothes and toys, and the victim refused. When the victim became defiant, he spanked her on her bottom, and the victim told him, "I'll get you back for this. I'll get you back." [Petitioner] said that approximately one week after the victim made this statement, he was arrested for abusing the victim. He said he believed the victim testified dishonestly about the abuse because she did not like him. He also asserted that the victim's brother testified falsely because he did not like him either. [Petitioner] denied watching pornography with the victim. He also denied telling the victim to masturbate in the shower. He claimed that the victim's mother or the victim's grandmother usually tucked the children into bed. [Petitioner] stated that although he recalled putting handcuffs on the victim and her brother while playing "cops and robbers," he denied molesting the victim during this game.

Theodore Smith, who had served in the military with [Petitioner], testified that he had been friends with [Petitioner] for the last four years. Smith said he was present on one occasion when [Petitioner] disciplined the victim by spanking her with an open palm, and the victim told [Petitioner], "I'm going to get you back for that." He witnessed [Petitioner's] arrest for abusing the victim approximately one week later.

Matthew Schwarz testified that he had known [Petitioner] for seven years, had worked with him, and had shared an apartment and house with him. He opined that [Petitioner] had been honest about his involvement with the victim.

Neva Abiles testified that she lived with [Petitioner], his wife, and his wife's children from December 2009 to March 2010, when [Petitioner] was arrested. During this time period, she did not observe [Petitioner] physically disciplining the victim, although she saw him take away games and send the victim to her room. Abiles stated that the victim did not react well to being disciplined.

*State v. Jonathan Mitchell Grimes*, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *1-4 (Tenn. Crim. App. June 26, 2015).

**POST-CONVICTION HEARING**

Petitioner timely filed a petition for post-conviction relief. Post-conviction counsel was appointed, and the petition was amended twice. An evidentiary hearing was conducted. Four witnesses were called to testify as to Petitioner's claims. Petitioner was represented by the Public Defender and an Assistant Public Defender in his trial proceedings. They will be collectively referred to as "trial counsels." It appears the Assistant Public Defender took the role as Petitioner's lead counsel, and the Public Defender participated as second counsel.

Lead counsel was the first witness to testify at the evidentiary hearing. She stated that she was currently retired but had worked as the lead counsel on Petitioner's case. She testified that she had previously worked both in criminal law and in bankruptcy law before working at the Public Defender's Office. She stated that she had a total of thirty-five years of legal experience.

Lead counsel testified that she could not remember how many times she met with Petitioner but that it was on a "pretty regular basis over a couple of years." She testified that she did not make any plea offers on behalf of Petitioner to the State. She explained that Petitioner was not interested in making any offers because he asserted "he was not guilty" and "he didn't do it, and he wanted to go to trial." Further, she stated that it was the client's "prerogative" to plead guilty or go to trial, and Petitioner was not interested in agreeing to a plea. Additionally, lead counsel testified that she did not believe Petitioner had any experience with the legal system before this case. She explained that she did not "even think he had a traffic ticket" on his record.

Lead counsel also testified about Petitioner's military career. She believed that he was proud of his service and that he wanted to continue serving. She did not recall reaching out to the National Guard State Headquarters to see if there was a plea offer that Petitioner could take and still continue his military career. She said that if Petitioner had mentioned this possible approach, she would have discussed it with Petitioner. Lead counsel added that she and Petitioner talked extensively about what the punishment might be if he was convicted, and Petitioner was not interested in accepting any negotiated guilty plea.

Lead counsel did not recall if Petitioner signed a written waiver acknowledging that he understood his rights, but she did remember that she had extensively discussed with Petitioner what the punishment might be and that Petitioner did not want to accept an offer. Additionally, she testified that she did not visit the marital home where the

incidents took place. However, she believed the investigator on Petitioner's case investigated the crime scene.

Regarding Petitioner's testimony at trial, lead counsel testified that Petitioner decided from the beginning that he was going to testify. She explained that she discussed with Petitioner how to answer "yes" and "no" questions. She further stated that she could not recall if they had any preparation sessions specifically with Petitioner, but normally she "did that sort of thing."

Regarding her background in sex related crimes, lead counsel testified that she had probably attended specialized CLE training for sex cases for rape, but she could not remember specific times. She stated she was also a member of the Tennessee Association of Criminal Defense Lawyers. Lead counsel did not recall filing any motions in limine or requesting a Tennessee Rule of Evidence 404(b) hearing by the trial court in Petitioner's case. Lead counsel did not believe the State made Petitioner any offers, but explained that in her practice, "if [she] got an offer on a case, [she] always discussed it and what the ramifications might have been." She believed that was the procedure she followed in Petitioner's case. Further, she stated that she and Petitioner had multiple conversations regarding Petitioner testifying at his trial and that she explained to him all the consequences if he were to testify. However, she did not advise him on testifying. She explained Petitioner had made the decision to testify himself and that he "did an excellent job."

Lead counsel also testified that she was unsure if she went to the District Attorney's office to discuss plea deals. She recalled that she may have talked to a prosecutor on the phone. She stated that she and the State had discussed an offer, but she did not remember if the State actually ever made the offer to Petitioner. However, she explained that Petitioner never indicated to her that he would have taken one.

Regarding the victim's medical record, lead counsel testified that she could not recall why the medical providers were not called to testify about the record. She believed it was something she and Petitioner had discussed but ultimately decided not to move forward with.

Lead counsel defended her line of questioning with Petitioner while he was on the stand. She explained that he was not going to admit to the crimes. She stated that Petitioner was "a very honest young man[.]" She stated that while she "believed him[,]" the jury did not.

On cross-examination, lead counsel testified that she and the prosecutor on Petitioner's case had worked on over one hundred cases together. She believed she went

to his office once a week to discuss cases with him.  She did recall that, in fact, at a bench conference during the trial, she told the trial court that the State had offered Petitioner a plea deal, but that Petitioner had refused it.  She explained that normally, she would come back with a counteroffer for the State, but it was her opinion that she could not come back with a counteroffer if her client was not interested in pleading guilty to anything.  Further, she explained that she did not feel like there was anything she could have done to negotiate an offer because Petitioner wanted to go to trial.

Lead counsel reaffirmed that she had met with Petitioner a number of times over the period of two years.  She explained that she talked with him "extensively" because rape of a child is a very serious criminal charge.  However, she stated that Petitioner still wanted to go to trial.  Lead counsel also explained that Petitioner was aware of the risks of testifying and that ultimately it was his right to testify. Further, she believed Petitioner was in a better position to testify than other defendants because of his lack of a prior criminal record.

The investigator for the district public defender was called as a witness.  He testified that he met with Petitioner a few times, but he could not recall the exact number of meetings.  He stated that he did not remember going out to the trailer where the acts were committed, but Petitioner had drawn a diagram of the inside one of the bedrooms. However, no photos of the residence were provided.

The investigator testified that the witnesses in Petitioner's case were scattered and it was difficult to get in touch with them.  He stated that the victim's mother moved to Iowa and was not subpoenaed for trial.  The investigator believed, based on the statement the victim's mother gave the investigator, it was in Petitioner's best interest for the victim's mother not to testify at the trial.

Second counsel testified that he was the District Public Defender for the Twenty-Eighth Judicial District and had held that position since September of 1989.  He did not recall when he started working on Petitioner's case.  He explained that he works with the Assistant Public Defenders by lending them advice and counsel.  He stated that sometimes he pairs up with Assistant Public Defenders to work on cases together and that all of the Assistant Public Defenders discuss their cases during the office meetings.  He testified that he had "general oversight" for everything within the office, but the Assistant Public Defenders do have authority to settle cases without his permission.

In Petitioner's case, second counsel testified that he discussed settling the case with Petitioner, but Petitioner was not desirous of pleading guilty.  He believed Petitioner firmly wanted to go to trial and be found not guilty.  He recalled that Petitioner did not want his military career to be affected, but second counsel testified that he did not reach

out to the National Guard Headquarters or the Judge Advocate General Corps to discuss a possible plea arrangement for Petitioner that would not adversely affect his military career.

Second counsel testified that he met with Petitioner several times, but he could not recall how long their meetings generally lasted. He did not recall if there were any pretrial motions filed in Petitioner's case, but he encouraged his Assistant Public Defenders to file motions if there was an issue in a case that could not be agreed upon informally. In trial preparation, second counsel explained that he and lead counsel "anticipated [Petitioner's] case going to trial pretty much from the get-go because that was [his] client's desire." He further stated that whoever is involved in a client's case "would be discussing with the client what the charge is, what the statutory penalties of that charge would be, also what lesser includeds there might be."

Additionally, second counsel addressed the decision not to call the medical providers who conducted the victim's medical report. He stated that he did not remember specifically as to why they were not presented, but he believed there might have been a limitation in place by the trial court that prevented the medical providers from testifying to the victim's history. Further, he testified that he did not remember Petitioner having any criminal record prior to his trial.

Second counsel testified that he and lead counsel did not explore any mental health issues related to combat service. He also recalled cross-examining the victim during trial. He acknowledged that the victim had already testified in general sessions court once before, but he stated that he did not use the transcript of that testimony to show prior inconsistent statements at trial because he did not want to badger the child witness. He explained that the theme of Petitioner's case was that Petitioner was innocent and that the victim was making up this story because she did not like being disciplined by him.

Second counsel also testified to his hiring practice for the Public Defender's Office. He stated that he looked for different things at different times when hiring, but the first two characteristics he looked for were "someone who is ethical" and someone who "will be competent to do the job." He agreed that the more experience an attorney had was a "good thing." In hiring lead counsel as an Assistant Public Defender, second counsel stated that he knew lead counsel prior to her working for him and he offered her a position when he had an opening at his office. He was aware that she had some experience in criminal law and acknowledged that she had also worked in areas of civil law before becoming a member of his office. However, he believed her to "be an asset" to the Public Defender's Office.

- 11 -

Second counsel was asked to read a highlighted portion of one page of the victim's medical report. Second counsel recited, "Mom says she lies and does it whenever gets in trouble. Problems started this school year when roommate moved in." Second counsel acknowledged that the evaluation referred to the victim as being untruthful, but he could not recall if that information was given to the jury during Petitioner's trial. Further, he stated that no one from the institution who provided the report testified at Petitioner's trial.

On cross-examination, second counsel stated that he had been the District Public Defender since the office had been created. Further, he stated that he had extensive experience in handling rape of child and murder cases. He did not believe he lacked experience in any area of criminal law as far as representing clients. He further stated that he believed lead counsel had more than adequate experience in criminal law for her to fill the Assistant Public Defender position. He acknowledged that she had been out of the state before taking the position, which required her a period of time to "catch-up[,]" but she was competent and ethical for the job.

Second counsel testified that he and the Assistant Public Defenders make several tactical decisions during trial. He explained that he did not want to badger a child witness in front of a jury and that there are limitations at trial with a child victim.

Second counsel reaffirmed that Petitioner had no desire in settling his case. He explained that if a client did not give him any authority about a proposed settlement then it was not usual for him to respond with counteroffers to the State. Additionally, he acknowledged that it was particularly difficult to settle sex crime cases. Second counsel testified that he met with Petitioner several times and discussed with him possible punishments if he were to be convicted. Second counsel could not specifically recall the manner in which he discussed this information with Petitioner, but he believed he had given that information to Petitioner prior to the trial. Moreover, second counsel testified that the Sex Offender Registry is a "monumental millstone around a person's neck" and often a roadblock in settling a case.

Second counsel testified that it was Petitioner's decision to testify at trial. In Petitioner's case, he believed that it was "absolutely imperative" that Petitioner testify because "it was particularly important that [the jury] hear from him." Second counsel also stated that Petitioner did a "superb job of handling the badgering that [the District Attorney] gave him" and that he handled the questions "with decorum, with stability, and with honesty." He did not believe it was a mistake to let Petitioner testify.

On redirect examination, second counsel did not recall how much time he spent preparing for opening and closing statements. He could not recall doing any in-depth

research on Petitioner's particular jury, but he explained that he and the Assistant Public Defenders try to look over jury lists with their clients and learn information about each potential juror's background.

Petitioner testified that the Public Defender's Office began representing him after he was indicted. He explained that lead counsel represented him from the time he was indicted until the conclusion of his jury trial. He testified that he met with lead counsel "probably five" times and each meeting lasted between forty-five minutes to one and one-half hours. He stated that he only met with second counsel once prior to his trial and that the single meeting lasted approximately forty-five minutes.

Petitioner testified that neither lead counsel nor second counsel explained to him lesser included offenses. He believed the only conviction he could have received at trial was rape of a child and that if the jury had found him not guilty of that charge, he thought his case would have been dismissed. He further testified that his trial counsels did not go over the Sex Offender Registry or what the ramifications were if he had pled guilty to a sexual battery charge. Petitioner explained that his trial counsels "glossed over some details" regarding pleading guilty. Additionally, he believed neither of his trial counsels contacted the military to discuss the possibility of entering a guilty plea which would not affect his military career.

Petitioner testified that when he decided he wanted to testify at trial, second counsel only prepared him for "about 15 to 30 minutes" despite Petitioner's inexperience with criminal trials. He stated that he was not aware that second counsel was on his case until just before trial. To Petitioner's knowledge, he did not think lead counsel ever told him she had tried a rape case, but acknowledged that lead counsel had worked on a murder case before. Regarding his representation, Petitioner said that he felt like his options were limited because he did not have money. He stated that he called lead counsel once a week about his case, but she would never have an update for him.

Additionally, Petitioner did not recall lead counsel ever telling him she was going to file a pretrial motion to keep out any testimony regarding other rape related allegations not included in Petitioner's indictment. He also explained that he was shown one offer from the State which he refused to accept. Petitioner testified that he believed the medical providers were going to be called for his defense and that the victim's medical report was going to be introduced into evidence.

Petitioner admitted that if the military had indicated that he could stay in the military if he pled guilty to some lesser offense other than rape of a child, he would have accepted that option if offered by the State. Petitioner stated that his trial counsels believed it was a good idea for him to testify because of his lack of a prior record.

On cross-examination, Petitioner testified that "knowing what it is [he] know[s] now, [he] would have tried to find a way in which [he] could still preserve [his] reputation in society." However, he conceded that he made no counteroffer to the State after he rejected the original offer. On redirect examination, Petitioner reaffirmed his lack of history and knowledge of the criminal justice system.

Following the conclusion of the evidentiary hearing, the post-conviction court made its ruling from the bench and denied Petitioner relief on all of his claims. The post-conviction court subsequently entered an order denying Petitioner relief and attached a copy of the transcript of the bench ruling as an exhibit. Petitioner filed a timely notice of appeal.

## ANALYSIS

Petitioner raises four claims of ineffective assistance of counsel: (1) trial counsels did not take reasonable steps to keep the State from presenting prejudicial evidence at trial that was not included in Petitioner's indictment, (2) trial counsels failed to communicate a favorable plea and failed to actively seek out a favorable plea for Petitioner, (3) trial counsels failed to visit or take photos of the crime scene, and (4) trial counsels failed to present evidence of the victim's medical history regarding her credibility. The State contends that the post-conviction court properly denied Petitioner relief on all of his claims. We agree with the State.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103*; Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v.*

- 14 -

*Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687; *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1966) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e. a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

*Failure to Prevent Admittance of Prior Acts*

Petitioner argues that his trial counsels failed to prevent the State from admitting evidence of uncharged allegations against Petitioner regarding the victim in a "separate jurisdiction" within Gibson County. Petitioner lists several "extremely prejudicial" allegations of prior acts by Petitioner that the jury was allowed to hear but that were not ultimately included in his indictment. The State contends that Petitioner has failed to present any evidence to show that he was prejudiced by the decisions of his trial counsels, and therefore, his claim is without merit.

Petitioner has failed to show with clear and convincing evidence that his trial counsels' failure to file pretrial motions preventing the State from introducing evidence of prior bad acts was prejudicial. This Court has routinely held that when a petitioner in a post-conviction proceeding asserts that trial counsel was ineffective by failing to call certain witnesses to testify, or by failing to interview certain witnesses, these witnesses must be called to testify at the evidentiary hearing; otherwise, a petitioner is asking this Court to grant relief based on speculation. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1990). The same standard applies when a petitioner argues that trial counsel was constitutionally ineffective for failing to file pre-trial motions to suppress evidence. *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436 at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed.* In such situations, in order to show prejudice a petitioner must show by clear and convincing evidence that (1) a motion to

- 15 -

suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Id*. (citing *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006)) abrogated on other grounds by *Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018) (citing *Strickland*, 466 U.S. at 687). A petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing. *Id*. "[I]t is likely a rare occasion indeed when the testimony of only the Petitioner and trial counsel could provide proof of the merit of a suppression motion[.]" *Id*. Here, Petitioner has failed to show that any action on the part of his trial counsels would have resulted in the trial court prohibiting the State from introducing the evidence. At the post-conviction hearing, Petitioner should have proceeded to submit the theory for relief and the evidence in support of the relief sought, which he asserts trial counsels should have done.

The requirement of this "hearing within a hearing" was also addressed in a similar case, *Shakir Adams v. State*, No. W2010-00217-CCA-R3-PC, 2011 WL 744736 (Tenn. Crim. App. Mar. 1, 2011), *perm. app. denied* (Tenn. Jul. 14, 2011). In *Adams*, the petitioner claimed his trial counsel was ineffective for failing to raise a 404(b) objection to a witness's testimony that she had seen the petitioner with a gun on other occasions. *Id.* at *11. This Court determined that the petitioner failed to show deficient performance in his evidentiary hearing:

> We note that the petitioner failed to conduct a 404(b) hearing at his post-conviction evidentiary hearing; therefore, any assertion that [the witness's] statement could have been properly excluded as a prior bad act does not clearly and convincingly establish deficient performance on the part of trial counsel.

*Id*. at *12. Similarly in the present case, the record reflects that Petitioner failed to conduct a 404(b) hearing within his evidentiary hearing to prove deficient performance or prejudice. Petitioner is not entitled to relief on this issue.

*Failure to Pursue and Communicate Plea Negotiations*

Petitioner argues that he received ineffective representation because his trial counsels failed to communicate to him a negotiated plea offer from the State, and trial counsels failed to pursue a favorable plea deal that would allow Petitioner to keep his military career. Further, Petitioner asserts that his trial counsels failed to adequately inform him of the plea bargaining process and the ramifications of going to trial. The State contends that the post-conviction court properly denied Petitioner relief on this claim.

Petitioner has failed to show by clear and convincing evidence that his trial counsels failed to obtain and/or communicate a negotiated plea agreement which Petitioner would accept. Petitioner argues that the State offered a plea deal that was not communicated to him by his trial counsels. Petitioner argued the offer made by the State was for sexual battery, 90 days in jail, and placement on the Sex Offender Registry. However, Petitioner has failed to show that any plea offer from the State was not communicated to him. Evidence presented at the post-conviction hearing regarding communicating plea offers revealed that Petitioner was adamant about going to trial from the beginning of his representation and that Petitioner was made aware of an offer by the State, but had ultimately refused it. Additionally, lead counsel testified that she did not make any offers to settle with the State because it was her "client's prerogative" as to whether to enter a guilty plea. She stated that "[Petitioner] was not interested in doing that" and that his position was "he was not guilty, and he was not going to take a plea offer for something he didn't do." Petitioner was adamant in his decision to take his case to trial. Both trial counsels testified that Petitioner was informed of the plea bargaining process and still wanted to take his case to trial. The post-conviction court found that in regard to his decision to go to trial instead of accepting an offer, Petitioner was "adequately advised as to what exposure he faced and that he chose to go to trial." Therefore, Petitioner has failed to show with clear and convincing evidence that his trial counsels were ineffective in communicating plea deals with him. We note that during the trial the prosecutor, during a bench conference, surmised that the case could have probably been settled for a guilty plea to sexual battery with 90 days of incarceration and being placed on the Sex Offender Registry. The post-conviction court found that Petitioner chose to go to trial rather than enter a negotiated guilty plea. Furthermore, Peititoner acknowledged at the post-conviction hearing that he told his trial counsels that he wanted to go to trial, that he was not guilty, and he was not going to enter a guilty plea to any offense. Thus, the evidence at the post-conviction hearing was that Petitioner would not have accepted an offer to plead guilty to sexual battery, even if that offer was made.

Second, Petitioner argues his trial counsels should have sought out a plea deal that would have allowed him to continue his service in the military. He argued that his trial counsels should have researched and contacted third parties, such as the Tennessee National Guard or the Judge Advocate General Corps, to see if Petitioner was eligible for continued military service in connection with a plea deal. Further, Petitioner asserts he was a candidate for Judicial Diversion, which "may have allowed him to reenter the military if he successfully completed the probationary diversion period." However, Petitioner failed to call any witness or put on any proof at the post-conviction hearing that any described and desired option was available to him prior to his trial. While both trial counsels testified that they had not reached out to the Tennessee National Guard, Petitioner failed to present any witnesses from the Tennessee National Guard or the

Judge Advocate General Corps to show that a favorable plea deal would have been available to him. As noted above, when a petitioner argues that trial counsel should have called a witness, presented certain evidence, or filed a motion, the witness, evidence, or motion should be presented at the post-conviction evidentiary hearing. *Taylor v. State*, 443 S.W.3d 80, 85 (Tenn. 2014) (quoting *Black*, 794 S.W.2d at 757); *Terrance Cecil*, 2011 WL 4012436 at *8; *Shakir Adams*, 2011 WL 744736 at *12. Here, Petitioner has failed to present any witness to show that he would have been given the option to plead guilty and continue his service in the military. Therefore, Petitioner has failed to show that his trial counsels were deficient in failing to seek out a plea deal to continue his military service or that such failure was prejudicial in his representation. Petitioner is not entitled to relief on this issue.

*Failure to Visit Crime Scene*

Petitioner argues that his trial counsels were ineffective for failing to visit or take photos of the crime scene where the incidents with the victim took place. He asserts that at his trial, the jury had nothing to reference in regards to the layout of the home where the allegations were made against Petitioner. The State contends that Petitioner has failed to present any witnesses or photos of the crime scene to show that the evidence would have assisted in his defense. We agree with the State.

Again, Petitioner did not present any evidence at the post-conviction hearing regarding the layout of the home or photos of the home to show that the lack thereof at trial was prejudicial to his defense. For the same reasons stated above, Petitioner is not entitled to relief on this issue due to his failure to present any evidence of prejudice by alleged deficient performance.

*Failure to Present Medical Records*

Petitioner argues that he was rendered ineffective assistance of counsel because his trial counsels failed to present the victim's medical records at trial to show credibility issues of the victim. Petitioner argues that his trial counsels neither entered the victim's medical record into evidence nor called the medical professionals to testify during Petitioner's trial and failure to do such was prejudicial to his defense. The State contends that Petitioner failed to show the admissibility of the medical record and failed to call the medical professionals as witnesses at the evidentiary hearing. Further, the State asserts that the victim was questioned as to the issues presented by the medical record.

Petitioner has failed to prove this claim with clear and convincing evidence. A one page report was admitted as an exhibit at the post-conviction evidentiary hearing. The one page exhibit shows it was one of ten pages of a multidisciplinary assessment by

Pathways of Tennessee, an affiliate of West Tennessee Healthcare. The date of intake for assessment was January 5, 2006. The following section was highlighted on the exhibit by Petitioner:

> Family issues. Mom worked [two] jobs [and] would leave child [with] roommate, Cheryl Pryor. Mom found them left alone, had watch[ed] porn movies, locked in closet. Police involved. DCS investigated. Mom has also been investigated for neglect. [Victim] has started telling school mom beats her [and] kicks brother. Mom says she lies [and] does it whenever [she] gets in trouble. Problems started this school [year] when roommate moved in. Mom gets very angry [and] frustrated [with] child. Threatens to send her off etc.

Petitioner argues that the medical record, along with testimony from the medical professionals, would have shown to the jury that the victim was dishonest and had hallucinations. However, the record reflects that the victim was questioned regarding some of the information at trial. A panel of this Court summarized the victim's testimony and the pertinent portion of her testimony is as follows:

> When the victim was asked if she remembered having hallucinations about bugs being on her in the hospital even though there were no bugs, she stated, "Really, I don't even know what was going on then." She stated that her babysitter did not show her pornographic movies; instead, she remembered "picking [the disks] up and thinking it was a movie and putting them in." She did not recall going to Pathways in 2006 for treatment for anxiety after the pornographic movies. The victim remembered "going to the doctors about the bugs and . . . seeing the movies, but that's all." She acknowledged that she did not inform the forensic interviewer or the district attorney about the incident in which the defendant tied her to a bed. However, she asserted that she told the forensic interviewer she could not remember everything that happened and was going to tell her about the incidents she remembered. The victim acknowledged telling the defendant on several occasions that she was going to get him back. She said she began to dislike the defendant when he began disciplining her and her brother and spanking them. She added, "I started not feeling comfortable with all that he'd been doing, touching me and hitting us and stuff, so I just started not liking him."

*Grimes*, 2015 WL 3929694, at *2.

In any event, Petitioner failed to present the medical professionals at the evidentiary hearing to testify as to what they could have said at trial. As repeatedly noted above, "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Taylor*, 443 S.W.3d at 85 (quoting *Black*, 794 S.W.2d at 757). Here, it is unclear whether Petitioner's defense would have benefited from the testimony of the medical professionals because they were not presented at the evidentiary hearing. Therefore, Petitioner has failed to present any proof that the medical record offered any information different than that which was already addressed with the victim at trial or that trial counsels' failure to call the medical professionals at trial was deficient and prejudicial to Petitioner's case. Petitioner is not entitled to relief on this claim.

Finally, due to Petitioner's failure to present any proof as to at least three of his claims to show prejudice at the evidentiary hearing, we feel compelled to stress the manner to show prejudice. If a petitioner argues that trial counsel rendered ineffective assistance of counsel by failing to argue a legal issue or present certain evidence, either testimony or exhibits, a repeat of such failure at the post-conviction hearing will most likely result in the failure to succeed on a claim of ineffective assistance of counsel.

Petitioner is not entitled to relief in this appeal.

CONCLUSION

The judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE

- 20 -